292                 October 15, 2025                 No. 908

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of the Adoption of A. M. F.,
a minor child.

M. F.
and K. F.,
*Petitioners-Respondents,*

*v.*

H. S.-S.,
*Respondent-Appellant.*

Clackamas County Circuit Court
23AP00459; A184828

Susie L. Norby, Judge.

Submitted July 23, 2025.

G. Aron Perez-Selsky filed the brief for appellant.

Andrew E. Teitelman filed the brief for respondents.

Before Kamins, Presiding Judge, Jacquot, Judge, and Armstrong, Senior Judge.

JACQUOT, J.

Affirmed.

**JACQUOT, J.**

Mother assigns error to the granting of a stepparent adoption petition filed by father and stepmother. A court may grant an adoption over the objection of a parent pursuant to the exception to the consent requirement authorized by ORS 109.324 if the court makes a finding that a parent has neglected or deserted the child without just and sufficient cause.[1] Mother argues that although she did not have any contact with child or provide any support during the relevant year before the adoption petition was filed, father prevented herf from having any contact with child. Mother also argues that because she was incarcerated for part of the year, circumstances made it very difficult to have contact, such that the court should have required her consent. Mother argues that because she would not give her consent, the trial court should have denied the petition for adoption.

When an adoption proceeding necessarily considers the termination of a parent's rights, even outside the dependency context, we are required to review the record of an adoption proceeding *de novo. See J. W. V. v. J. L. W.*, 324 Or App 393, 395, 525 P3d 1237 (2023). Although *de novo* review is otherwise discretionary in appeals from judgments in equitable proceedings, in an adoption, if the "court is asked to terminate every right and interest of the natural parent,"

---

[1] ORS 109.324 provides, in relevant part:

"(1) If a parent is believed to have willfully deserted the child or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption, and if the parent does not consent in writing to the adoption, [a petitioner may follow the statutory procedure for seeking an adoption order] without the parent's consent.

"(2) Upon hearing * * *, if the court finds that the parent has willfully deserted the child or neglected without just and sufficient cause * * *, the consent of the parent at the discretion of the court is not required and * * * the court may proceed regardless of the objection of the parent.

"(3) In determining whether the parent has willfully deserted the child or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may:

"(a) Disregard incidental visitations, communications and contributions; and

"(b) Consider, among other factors the court finds relevant, whether the custodial parent has attempted, without good cause shown, to prevent or to impede contact between the child and the parent whose parental rights would be terminated in an action under this section."

then the "adoption proceeding [is], at least in part, a proceeding for the termination of parental rights." *Id.* (internal quotation marks and citation omitted). We defer to the demeanor-based credibility determinations made by the trial court. *E. A. R. v. R. B. E.*, 327 Or App 614, 615, 535 P3d 793, *rev den*, 371 Or 511 (2023).

We have reviewed the record and we conclude that father and stepmother met their burden of demonstrating by clear and convincing evidence that mother willfully deserted or neglected child without just and sufficient cause: Mother was seventeen when child was born. Father admitted he had a drug problem when child was young, and he did not establish paternity during the first year of her life. Maternal grandmother sought a guardianship over child in court and mother consented. The Oregon Department of Human Services became concerned about child when grandmother lost her housing. Grandmother and child were staying in hotels and mother did not live with them. After a few years of occasional visits with child organized through grandmother, father went to treatment, where he met stepmother. He testified that he changed his priorities and started making efforts to be more involved in child's life. Father established paternity in court and then obtained custody of child. Mother and grandmother did not respond in the domestic relations case. The custody judgment provided for four hours a week of visitation with mother and grandmother, if it could be accomplished safely. Father initially set up a few visits with grandmother but discontinued them when grandmother brought mother to one of the visits and a loud altercation ensued. Stepmother called the authorities, and law enforcement arrested mother, who had warrants, in a chaotic scene. Mother has not seen child since that day. Mother was convicted of multiple counts of unauthorized use of a vehicle and was sentenced to prison.

Mother testified that, once father had child in his care and before she was sentenced to prison, she contacted father multiple times to try to arrange contact with child. This was more frequent during time periods when she did not have warrants. There is some dispute about whether father and stepmother blocked her calls, but they did not agree to

allow mother any contact with child. During the hearing, father testified that mother was dangerous for child, that he had ignored at least some of mother's attempts to have contact and deleted some of her messages. When asked why he didn't respond to a request from mother's sister to set up a visit between mother and child, father answered,

"Because I don't agree with any of it. * * *

"I feel like [this] is all made up and nobody actually cares about [child] coming from her."

Mother's counsel then asked, "Do you want [child] to have a relationship with [mother]?"

Father answered, "No, I do not."

Father went on to explain that he thought mother was dangerous, used drugs, hung around with dangerous people, and had guns around. He testified that he thought he had to provide mother with parenting time only if he deemed her safe to be around child.

Mother testified that, in addition to calling and texting father and stepmother, she had other people send him messages through Facebook or text. Father acknowledged receiving some messages from mother and her sister but not responding to any of them. Mother said she also wrote letters and bought small gifts for child but did not deliver them because she did not know the address where child was living. Father testified that mother's brother requested child's address to send gifts, but shortly after father gave it to mother's brother, a car belonging to father's mother, located at the address, was vandalized and no gifts were ever delivered there.[2]

After analyzing that set of facts, the trial court issued a thorough letter opinion and took judicial notice of nine other cases involving the family. It cited ORS 109.324 and noted that it could disregard incidental visitations, communications, and contributions. The trial court also noted that it could consider whether the custodial parent had attempted to prevent or impede contact between the nonconsenting parent and child without good cause shown. The

---

[2] The trial court judge attributed that vandalism to mother.

court considered the period before the relevant year prior to the filing of the petition, finding,

> "Maternal grandmother became [child's] guardian because mother neglected parental duties from the beginning of [child's] life. * * *

> "After father secured custody of [child], mother testified that she avoided visits at times out of concern that she may be arrested on outstanding warrants at a visit. * * *

> "Mother had greater opportunity to provide care and maintenance for [child] before mother was incarcerated, but even when the opportunity existed, mother did not avail herself of it. * * *

> "[A]ttempting to plan future contact with [child] * * * does not rise beyond incidental outreach. Taking a parenting class to begin to learn how to parent a child does not constitute a 'visitation, communication or contribution' to * * * child's care. * * *

> "Father did not impede contact between mother and [child] without good cause. Concerns for [child's] safety with mother had existed * * * [including instances such as a restraining order protecting grandmother and child from mother and a visit where police were called to intervene after father obtained custody].

> "Mother has neglected [child] for years without just and sufficient cause, both when mother was at liberty, and during her recent incarceration. The only impediments that father has used to create safe boundaries for contact between mother and [child] have been done for good cause, to protect [child] from trauma."

On *de novo* review, we see the import of the facts in a similar manner as the trial court did. In *Eder v. West*, 312 Or 244, 266, 821 P2d 400 (1991), the Supreme Court characterized our inquiry in "willful neglect" cases as whether, during the year preceding the filing of the petition, the "nonconsenting parent willfully fail[ed] to manifest substantial expressions of concern which show that the parent has a deliberate, intentional, and good faith interest in maintaining a parent-child relationship[.]". Mother's pattern of spending time with child occasionally at her convenience early in child's life was interrupted by a restraining

order preventing contact with child and then by subsequent incarcerations, in jail and then prison. She never responded to the paternity or custody petitions. Under the totality of the circumstances, mother's attempts to reach out to father were incidental expressions of concern. Father's reaction to mother's attempts to reach out may not have been optimal for preserving or creating a positive relationship between mother and child, but the trial court credited father with a good-faith, safety-founded motivation for denying future contact between mother and child. Mother never developed the parent-child relationship with child such that we could find an exception to "willful neglect." We affirm.

Affirmed.